JOHNSON, J.
This is an appeal from a declaratory judgment construing a water supply contract. The City of Lake Oswego supplies water to the Tigard Water District pursuant to a written contract dated October 17,1972. The city determined in 1975 after an engineering study to increase its rate to all users in order to finance future expansion, and increased Tigard’s rate from 140 to 250 per 100 cubic feet. Tigard instituted this proceeding to declare the city’s action invalid under the contract. Subsequently, on September 3,1976, the city advised Tigard that it was terminating the contract effective October 17, 1976. The trial court held that the rate increase and the termination were invalid. The city appeals on several grounds which are irrelevant in view of our construction of the contract.
The pertinent provisions of the agreement are:
"It is hereby declared to be the purpose of this Agreement to:
"1. Make available to District surplus water supply from City to reasonably meet District’s normal daily requirements.
"2. Guarantee to City an annual income of not less than $24,000 from sale of surplus water to District.
"3. Establish a schedule of purchase and delivery of such water that will best serve the needs and requirements of both City and District.
"District agrees to pay monthly to City, on or before the 21st day of each month, for all water delivered to District during the immediately preceding calendar month at the rate of fourteen cents (140) per 100 cubic feet. * * *
* * * *
"City reserves the right at any time to review the rate and schedule of charges for surplus water furnished to outside bulk water users as fixed in accordance with terms and provisions of Ordinance No. 1425 of the City of Lake Oswego, and to make such adjustments as may be found necessary in sole discretion of City, to reflect *[74] increased costs for the production and distribution of surplus water under existing Agreements with said outside bulk users of surplus water. In the event that Lake Oswego adjusts and/or increases said rates, any increase shall not become effective until not less than 60 days written notice of such rate change is given to District.
* * * *
"This agreement shall be effective, except as hereinafter provided, for an initial period of four years from date of execution, and shall automatically be renewed for subsequent four-year periods, subject to the provisions hereinafter set forth.
"This Agreement may be terminated by City at the end of the initial four-year period, or the end of any subsequent four-year period, by giving at least one year’s written notice of its intention to do so upon City’s good faith determination that insufficient water is available to meet District’s requirements and the requirements of City’s own system. Termination may be effected by District upon the giving of not less than 60 days’ written notice to City for such reasons as District, in its sole discretion, might determine.
"City reserves the right to interrupt or curtail deliveries of surplus water to District, but in such event will make every reasonable effort to give advance notice of service curtailment to District. * * *”

Rate Increase

The trial court made findings that (1) under the contract, rates may only be increased if the city incurs an increase in production and distribution costs, and that (2) in fact the city’s costs had decreased. Both of these findings are dependent upon another finding which reads:
"Any method of financing the future expansion and/or improvement of Lake Oswego’s water treatment system is not such a cost as was contemplated by the parties to be included in the contractual language, 'increased cost of production and distribution of surplus water.’ The quoted language contemplates an actual indebtedness incurred which is directly attributable to *[75] producing and distributing water to the Tigard Water District.”
There is no evidence outside the contract to support the trial court’s finding concerning the contemplation of the parties.[1] The trial court’s finding was a conclusion of law based solely on its interpretation of the "increased costs for the production and distribution” language in the contract.
The trial court’s interpretation that the city may only consider costs resulting from "an actual indebtedness incurred which is directly attributable to producing and distributing water” to Tigard presents problems suggesting that the parties may have contemplated something different. For example, is it possible for the city to make a precise cost segregation which separates those costs "directly attributable” to supplying Tigard? The city serves a multitude of customers including its residents and several contract purchasers in addition to Tigard. Presumably any cost increase in producing water would affect the cost of producing surplus water for Tigard.
Tigard does not contend that the city could not consider expansion costs. The undisputed evidence was that the city needed to expand its production capacity to meet future needs because of population increase and the needs for surplus water of its contract purchasers such as Tigard. Tigard’s position, which the trial court adopted, was that the costs must be actually incurred either in the form of a bond issue or actual construction. Following this rationale the city would *[76] be precluded from raising rates because of increased depreciation for equipment since depreciation is merely an accounting device. Actual depreciation costs are not incurred until equipment becomes unusable. Likewise, increased reserves for contingencies such as bad debts could not be considered because such costs are not yet incurred. Finally, the city would be precluded from making any increase in its rates to establish a sinking fund to pay for the future expansion.
When the city first announced the rate increases, it was contemplating passage of a proposed bond issue which was subsequently defeated by the voters prior to trial. At trial, witnesses for the city testified that the city was now considering establishing a sinking fund, or possibly combining a sinking fund with submission of another bond issue to the voters some time in the future. In the meantime, it was the city’s judgment that the rate increases were necessary and would eventually be used in some manner to finance the needed expansion. A corporate executive might characterize this modus operandi as unbusinesslike, but to a local public official confronted with the problem of passing a bond issue, it is a common practice procedure. It is understandable that in entering contracts of this nature a city would want to retain flexibility.
It is also reasonable to assume that the parties to this contract did not contemplate a one-sided bargain. Indeed, the undisputed evidence is that the parties were negotiating in a seller’s market. The city was offering water at a rate considerably less than Tigard’s alternate supplier, the City of Portland. Yet the effect of the contract as interpreted by the trial court is that the city could not increase its rate unless "an actual indebtedness is incurred which is directly attributable to producing and distributing water” to Tigard. Further, the city could not in good faith terminate the contract on one year’s notice if the only reason for termination was that the district refused to pay an increased rate other than that made pursuant to the *[77] terms of the contract. On the other hand, the district was free to terminate any time "for such reasons as District in its discretion, might determine.” We doubt that either party contemplated such a result.
Considering the inherent difficulties of contractually formulating price escalation clauses in long-term supply agreements, the public financing problems that confront any public agency, the status of the parties and, most important, the express terms of the contract, we conclude the trial court misconstrued what the parties intended by the contract.
The contract states that "the city reserves the right at any time to review the rate * * * and to make such adjustments as may be found necessary in sole discretion of City,” subject to 60 days notice. A reasonable construction of that language is that the escalation of rates for increased costs was for the city to determine. "Sole discretion” means that the decision is solely for the city and not subject to review. If the district disagrees with the city, its remedy under the contract is not in the courts but in termination of the contract and purchase of its water elsewhere.

Termination

The trial court’s conclusion that the city’s termination of the contract was not in good faith was premised on the following finding:
"Defendant has sufficient surplus water to meet the requirements of Plaintiff and the Defendant’s own users because Defendant can always curtail or interrupt the supply of surplus water to Plaintiff any time Defendant has insufficient water to supply both Defendant’s need and to also supply Plaintiffs needs.”
This again is a conclusion of law based on an erroneous interpretation of the contract. By the trial court’s reasoning the city could never terminate the contract pursuant to the termination provisions, but could only "interrupt or curtail” deliveries. The trial court’s construction would nullify the one-year termination provision and deny Tigard the protection of *[78] notice under that provision. There was no direct evidence of bad faith. In view of our holding that the city had a legal right to increase the rates, we conclude that there was no bad faith.
Reversed.

 Another provision that superficially would appear to restrict the city’s power to increase rates states:
"City shall own, operate, maintain, repair or replace all water system facilities necessary to furnish water to the outlet side of the master water meter used for measuring the quantity of water delivered to District, but City shall make no separate charges to District for such maintenance, repair or replacements.”
However, neither party made reference to this provision either at trial or on appeal. We can only discern from the context that the provision relates to those hookup and metering facilities that directly relate to supplying Tigard, not facilities used generally for producing and distributing water.